No. 16-55249

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, D/B/A NIFLA, a Virginia corporation; PREGNANCY CARE CENTER, D/B/A PREGNANCY CARE CLINIC, a California corporation; and FALLBROOK PREGNANCY RESOURCE CENTER, a California corporation,
*Plaintiffs–Appellants*

v.

KAMALA HARRIS, in her official capacity as Attorney General for the State of California, THOMAS MONTGOMERY, in his official capacity as County Counsel for San Diego County; MORGAN FOLEY, in his official capacity as City Attorney for the City of El Cajon, CA; and EDMUND D. BROWN, JR., in his official capacity as Governor of the State of California,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of California
No. 3:15-cv-02277-JAH-DHB – Hon. John A. Houston

## REPLY BRIEF FOR APPELLANTS

Matthew S. Bowman
David A. Cortman
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
mbowman@ADFlegal.org
dcortman@ADFlegal.org

Dean R. Broyles
California Bar No. 179535
THE NATIONAL CENTER FOR LAW AND POLICY
539 West Grand Avenue
Escondido, California 92025
(760) 747-4529
dbroyles@nclplaw.org

Kristen K. Waggoner
Kevin H. Theriot
Elissa M. Graves
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
kwaggoner@ADFlegal.org
ktheriot@ADFlegal.org
egraves@ADFlegal.org

Anne O'Connor
NATIONAL INSTITUTE OF FAMILY
  AND LIFE ADVOCATES
5601 Southpoint Centre Blvd.
Fredericksburg, VA 22407
(540) 372-3930
AOConnor@nifla.org

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ..........................................................iv

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................... 2

I.   The Act is subject to strict scrutiny. .......................................... 2

    A.   The Act is both content and viewpoint discriminatory, and therefore strict scrutiny applies. ...................................................................... 2

    B.   The Act's application to medical facilities is not a mere regulation of professional conduct, and is thus not subject to rational basis review. ....................... 5

    C.   The Act is not a regulation of commercial speech. ...... 12

        1.   The fact that Plaintiffs offer information and services does not transform them into commercial speakers, since they offer those things outside of any commercial transaction or economic motive. ........................... 13

        2.   Rational basis review does not apply. ................... 22

II.  The Act violates the Plaintiffs-Appellants' right to the Free Exercise of Religion. ..................................................... 24

III. Plaintiffs-Appellants' challenge to the Act is ripe. ............. 26

CONCLUSION ......................................................................... 30

CERTIFICATE OF COMPLIANCE ...................................... 32

CERTIFICATE OF SERVICE ............................................... 33

# TABLE OF AUTHORITIES

## Cases

*Abbot Laboratories v. Gardner*,
  387 U.S. 136 (1967) .................................................................. 29

*American Academy of Pain Management v. Joseph*,
  353 F.3d 1099 (9th Cir. 2004) ................................................ 13–14

*Arizona Right to Life PAC v. Bayless*,
  320 F.3d 1002 (9th Cir. 2003) ................................................ 27–28

*Babbitt v. United Farm Workers National Union*,
  442 U.S. 289 (1979) .................................................................. 28

*Bland v. Fessler*,
  88 F.3d 729 (9th Cir. 1996) ........................................................ 27

*Board of Trustees of State University of New York v. Fox*,
  492 U.S. 469 (1989) ......................................................... 12, 17, 21

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) .................................................................... 14

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
  520 U.S. 564 (1997) .................................................................. 17

*Central Hudson Gas & Electric Corp. v. Public Service
  Commission of New York*,
  447 U.S. 557 (1980) ............................................................. 12, 21

*Centro Tepeyac v. Montgomery County*,
  722 F.3d 184 (4th Cir. 2013) .................................................. 20–21

*Centro Tepeyac v. Montgomery County*,
  779 F. Supp. 2d 456 (D. Md. 2011) ............................................ 21

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ........................................................................ 24

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) ................................................... 1, 8–9

*Evergreen Association v. City of New York*,
   740 F.3d 233 (2d Cir. 2014)......................................... 10–11, 15–16

*Fargo Women's Health Organization Inc. v. Larson*,
   381 N.W.2d 176 (N.D. 1986) .......................................................... 18

*First Resort, Inc. v. Herrera*,
   80 F. Supp. 3d 1043 (N.D. Cal. 2015) ............................................ 19

*Gaudiya Vaishnava Society v. City and County of San Francisco*,
   952 F.2d 1059 (9th Cir. 2011) ................................................... 17, 21

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor & City*
   *Council of Baltimore*,
   721 F.3d 264 (4th Cir. 2013) ................................................... 20– 21

*Hotel Employees & Restaurant Employees International Union v.*
   *Nevada Gaming Commission*,
   984 F.2d 1507 (9th Cir. 1993) ........................................................ 29

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*,
   515 U.S. 557 (1995) .................................................................. 3, 22

*In re Primus*,
   436 U.S. 412 (1978) ......................................................................... 5

*Jamison v. Texas*,
   318 U.S. 413 (1943) ....................................................................... 15

*Lopez v. Candaele*,
   630 F.3d 775 (9th Cir. 2010) ......................................................... 26

*Majors v. Abell*,
317 F.3d 719 (7th Cir. 2003) ........................................................ 28

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) ...................................................................... 15

*National Association for the Advancement of Colored People v. Button*,
371 U.S. 415 (1963) .............................................................. 5, 9–10

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
475 U.S. 1 (1986) ............................................................................ 3

*Pickup v. Brown*,
728 F.3d 1043 (9th Cir. 2013) ................................................. 1, 6–9

*R.A.V. v. St. Paul*,
505 U.S. 377 (1992) ........................................................................ 4

*Reed v. Town of Gilbert*,
135 S.Ct 2218 (2015) ............................................................... 2–4, 9

*Retail Digital Network, LLC v. Appelsmith*,
810 F.3d 638 (9th Cir. 2016) ........................................................ 24

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) .............................................. 4–6, 16, 20–22

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) ........................................................................ 3

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ..................................................... 4, 5, 9, 23–24

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ...................................................... 29

*Susan B. Anthony List v. Driehaus*,
134 S. Ct. 2334 (2014) .................................................................. 29

*Thomas v. Anchorage Equal Rights Commission,*
  220 F.3d 1134 (9th Cir. 2000) ........................................ 27

*United States v. Dreyer,*
  804 F.3d 1266 (9th Cir. 2015) ........................................ 25

*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013) ................................. 12–14, 18–19, 21

*Virginia v. American Booksellers Association,*
  484 U.S. 383 (1987) ........................................ 28

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer
  Council, Inc.,*
  425 U.S. 748 (1976) ........................................ 12

*Virginia Vermiculite, Ltd. v. W.R. Grace & Company – Connecticut,*
  156 F.3d 535 (4th Cir. 1998) ........................................ 17

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ........................................ 4

*West Virginia State Board of Education v. Barnette,*
  319 U.S. 624 (1943) ........................................ 3

*Wolfson v. Brammer,*
  616 F.3d 1045 (9th Cir. 2010) ................................. 26–30

## INTRODUCTION

The Act being challenged in this case violates the Free Speech Clause of the First Amendment because it is a blatant content- and viewpoint-based regulation, cannot satisfy strict scrutiny, and is not subject to lower scrutiny levels under inapplicable theories of commercial or professional speech. The legislature expressly declared the Act seeks to target specifically pro-life "crisis pregnancy centers" because it disagrees with the information they provide about abortion and their goal of pro-life persuasion. The Act pursues this targeting purpose by a content-based means: forcing Plaintiffs to express the government's speech. There is no commercial element in the Act or among Plaintiffs' activities, and the Act mandates speech outside of therapeutic conduct under *Pickup* and *Conant*.

The Act also runs afoul of the Free Exercise Clause of the First Amendment for similar reasons, since targeting pro-life religious viewpoints is neither neutral nor generally applicable, and the Act directly implicates Plaintiffs' hybrid rights claim in conjunction with free speech rights that are "colorable" and then some. The District Court's denial of injunctive relief should therefore be reversed.

1

## ARGUMENT

### I.    The Act is subject to strict scrutiny.

#### A. The Act is both content and viewpoint discriminatory, and therefore strict scrutiny applies.

The State Defendants' brief, their brief below, the District Court's decision below, and the express legislative purpose in the record, all agree on one thing: the Act targets pro-life viewpoints. The State admits in its brief that the Act's purpose and justification are to target "crisis pregnancy centers" whose "principal aim is to discourage or prevent women from seeking abortions," by practices the State believes "misinform" women. State Br. at 5. This is, by definition, a viewpoint based purpose and justification. Aiming to discourage abortions is a viewpoint on abortion. When the State calls information that Plaintiffs provide about abortion "misinform[ation]" it is expressing a disagreement with a spoken viewpoint on a controversial issue. Targeting "crisis pregnancy centers" defined as anti-abortion centers is likewise the targeting of speakers with a particular viewpoint.

This is viewpoint discrimination subject to strict scrutiny under *Reed v. Town of Gilbert,* 135 S. Ct. 2218 (2015). *Reed* sets forth and clarifies how the First Amendment applies to any government law

abridging free speech and expression. *Id.* at 2226–27. *Reed* declares that "strict scrutiny applies" when "the purpose and justification for the law are content based," regardless of whether it's also true that the "law is content based on its face." *Id.* at 2228. "Viewpoint discrimination is [] an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Thus *Reed*'s application of strict scrutiny to content-based speech regulations must also, at minimum, apply to viewpoint-based regulations. In fact, a good argument can be made that under Supreme Court caselaw, viewpoint-based speech regulations are not only subject to strict scrutiny, but are unconstitutional *per se*.[1]

---

[1] *See, e.g., Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995) ("The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis. [] While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.") (citing *W. Va. State Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), and *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20 (1986)).

In short, under *Reed* if rules "were adopted by the government 'because of disagreement with the message [the speech] conveys,'" the Court must apply strict scrutiny. 135 S. Ct. at 2227 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Even if a statute is neutral on its face, this does not immunize it from strict scrutiny (or worse) if its purpose or justification is content- or viewpoint-based.

The Act's viewpoint discriminatory quality is similarly evident under the Supreme Court's analysis in *Sorrell v. IMS Health Inc.,* 564 U.S. 552 (2011), where the legislature declared it was legislating because particular speakers "convey messages that 'are often in conflict with the goals of the state,'" and "legislative findings . . . confirm that the law's express purpose and practical effect are to diminish the effectiveness of marketing by" them. *Id*. at 564–65. Thus, based on "the legislature's expressed statement of purpose," the statute went "beyond mere content discrimination, to actual viewpoint discrimination." *Id*. (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)). The same conclusion is inescapable here.

Finally, by definition, the Act compels speech of certain content. That makes it a content-based regulation of speech. *See Riley v. Nat'l*

*Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (a compelled speech law "necessarily alters the content of the speech").

### B. The Act's application to medical facilities is not a mere regulation of professional conduct, and is thus not subject to rational basis review.

The Act's viewpoint and content discrimination requires no less than strict scrutiny. In the commercial context of *Sorrell*, a commercial context (which this case is not), heightened scrutiny was imposed. 564 U.S. at 565. Here, where neither the Act nor Plaintiffs implicate any commercial interests, a higher form of scrutiny is mandated, meaning the Court should apply no less than the compelling interest test.

In the professional context, too, the Supreme Court has required strict scrutiny where a licensed professional is pursuing pro bono expressive purposes. In *In re Primus*, 436 U.S. 412, 434 (1978), a case regulating the legal profession, the court required the compelling interest test to be applied rules that burden attorney speech when they are pursuing *pro bono* public interest goals. *See also NAACP v. Button*, 371 U.S. 415, 438 (1963) (applying the "compelling state interest" test to a ban on a certain types of solicitation of nonprofit legal business).

5

Notwithstanding this overriding precedent, the State Defendants seek to apply rational basis scrutiny by use of professional speech cases that do not even fit the present situation. The State relies primarily on *Pickup v. Brown,* 740 F.3d 1208 (9th Cir. 2014), for the notion that the Act is not a regulation of speech at all. Such a conclusion would be inconsistent with *Riley*, which declared that forcing someone to speak particular words is not only a regulation of speech, but also "necessarily alters the content of the speech." 487 U.S. at 795. The State's conclusion is also unsupported by *Pickup* itself, which dealt with a law that did not compel specific speech, but banned a particular *therapy* for persons of a certain age. 740 F.3d at 1223. Only because the law in *Pickup* banned a health *treatment* did the Court deem it to regulate mere conduct rather than speech. *Id.* at 1229.

The Act here does not regulate treatment at all, much less require it or ban it. It does nothing but require certain speech, and it does so outside of any treatment. The law that was deemed a mere conduct restriction in *Pickup* required no speech. This Act requires specific speech. There was "just one thing" the law in *Pickup* did: reaching directly into a health treatment by banning it for certain patients. *Id.* at

6

1223. Unlike the law in *Pickup*, which reached directly into a health treatment, this Act's compelled speech occurs in the waiting room of a licensed center (or on the ads of an unlicensed center), outside the context of any treatment regimen. The Act's compelled speech here is not even *incidental* to a specific treatment—for example, a statement required to obtain informed consent for performing an ultrasound. The people to whom the Act's compelled speech is directed need not be present for any treatment or ever receive one, but might just visit the waiting room or fill out forms in order to receive other kinds of assistance like baby clothes. Therefore *Pickup* in no way implies that the Act's compelled speech is a mere conduct regulation.

The State Defendants' interpretation of *Pickup* would mean any professional could be required to say anything and it would never be a speech regulation. This cannot be squared with *Pickup*, which specifies that many professional regulations are *speech* regulations: "[D]octor-patient communications *about* medical treatment receive substantial First Amendment protection." *Id*. at 1227. "[P]ublic dialogue" that is not "within the confines of a professional relationship" receives the "greatest" level of First Amendment protection, and receives some

protection even within the doctor-patient relationship. *Id.* Here the Act requires speech in the waiting room outside those confines.

On how to distinguish First Amendment which kinds of speech to patients receives which kinds of scrutiny, *Pickup* specified that it was restating and drawing from *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), and not undermining that ruling. *Pickup*, 740 F.3d at 1226–27. *Conant* struck down, as a speech regulation, a ban on doctors recommending medical marijuana to patients. 309 F.3d at 637. *Pickup* specifies that it would be applying the more rigorous analysis of *Conant* if "the government's policy prohibited speech wholly apart from the actual provision of treatment." That is exactly what the Act does in this case (except in the form of compelled rather than prohibited speech) because the required speech occurs in the waiting room to people who might never get treatment, and is not even required as being incident to any particular treatment. In fact, the speech protected in *Conant* occurred in a conversation between a doctor and a patient, yet *Conant* and, by extension, *Pickup*, still considered that speech sacrosanct. The Act's compelled speech here should be judged similarly to the law in *Conant*. The Act does not connect its compelled speech to any particular

treatment or any treatment at all, but just as a message prioritizing abortion that pro-life centers must tell pregnant woman.

*Pickup* also declares that *Conant*'s standard applies where a regulation is content- or viewpoint-based. *Pickup*, 740 F.3d at 1226 (citing *Conant*, 309 F.3d at 637). Here, as discussed above and in the opening brief, the Act is viewpoint based under *Reed* and *Sorrell* for its explicit purpose and justification against pro-life viewpoints, and also content-based under *Riley* for requiring words of a certain content.

The State's position is not only inconsistent with *Pickup* and *Conant*, but is inconsistent with the Supreme Court's ruling in *NAACP*. There the court held that "regulatory measures … no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights." *NAACP*, 371 U.S. at 439. (quotation omitted)). The Act's explicit purpose and justification is to stifle the viewpoint and content of pro-life centers' speech. Moreover, "[b]road prophylactic rules in the area of free expression are suspect," even where professional speech is concerned. *Id.* at 438. The Act here is a quintessential "prophylactic" measure since it imposes its disclosures even on pregnancy centers that engage in no

9

wrongdoing and pursue no economic motive. "[A] State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *Id.* at 439.

The State further contends that the Act is permissible as a professional regulation that has merely an "incidental effect" on speech. *See* State Br. at 25. Forcing someone to speak in a certain way is not "incidental" to their free speech rights. The State Defendants are incorrect that a lesser standard of review applies that would allow them to justify coerced speech as "incidental." As discussed above, the viewpoint based purpose and justification of the law and its application to pro bono public interest activities do not allow deferential levels of scrutiny to be applied to this rule. The State is forcing economically disinterested advocates of a viewpoint on the contentious issue of abortion to begin all their speech with a drastic contradiction to their view of preborn children as co-patients, by telling women where they can get free abortions.

The Second Circuit rejected a similar government view in *Evergreen Association v. City of New York*, 740 F.3d 233, 249-50 (2d Cir. 2014). There it assumed that intermediate scrutiny applied, the same

10

standard the State seeks under its professional speech theory here, but the court nonetheless declared that because of "the political nature of the speech," namely, that "the context is a public debate over the morality and efficacy of contraception and abortion," and because it "requires pregnancy services centers to advertise on behalf of the" government, it must be struck down. *Id.* at 249–50. The same is true here: the compelled speech for licensed centers requires them to advertise the government's subsidized abortion program, an option anathema to the non-commercial expressive purpose of the pro-life centers. There is nothing incidental, nor justifiable under professional speech precedent, about the Act's coerced speech. The State Defendants attempt to argue that *Evergreen* is "inapposite" on this point because it applied to non-medical centers. State Br. at 32. This is immaterial because *Evergreen* reviewed the abortion-mentioning disclosures in that case by assuming, without deciding, that intermediate scrutiny applied, and then concluding that disclosures discussing abortion cannot even satisfy that lower standard. Since the State asks this Court to apply the same intermediate level of scrutiny to professional regulations here, it cannot distinguish *Evergreen*'s conclusion regarding those disclosures.

**C. The Act is not a regulation of commercial speech.**

Defendants attempt to classify the mandated disclosures required by the Act for both licensed and unlicensed pregnancy centers as regulations of commercial speech. The Supreme Court has reiterated that commercial speech is defined as that which does no more than "propose[] a commercial transaction," *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989), or that "relate[s] solely to the economic interests of the speaker and its audience," *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62 (1980). The Ninth Circuit follows this rule by affirming that "commercial speech is that 'which does no more than propose a commercial transaction.'" *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)).

The Act contains no element saying that it only regulates centers if they propose commercial transactions or in the context of such transactions, and no element imposing the disclosures only in contexts where centers are solely advancing their economic interests. Moreover, the uncontroverted record shows that Plaintiff Centers themselves lack

12

any commercial transactions, both in general and in the context where the disclosures occur. All of Plaintiffs' information and services are free of charge. EOR 2–3; 34. Neither they, nor the Act itself, can be characterized as implicating commercial speech under *Valle Del Sol*.

> **1. The fact that Plaintiffs offer information and services does not transform them into commercial speakers, since they offer those things outside of any commercial transaction or economic motive.**

The State Defendants argue that because Plaintiffs offer various pregnancy services of value their speech is commercial even though those items are free. No court has adopted such a rule, and the actual precedential definition of commercial speech cannot be reconciled with it. This Court has insisted that speech is not commercial unless it "solely" implicates Plaintiffs' economic interests and "does no more than" propose a commercial transaction." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004); *Valle Del Sol*, 709 F.3d at 818. But the Act is not a commercial speech regulation: it contains no commercial or economic requirement at all, and instead regulates speakers possessing no such characteristics. That includes Plaintiffs, who provide their information and services for free. Giving someone something for free is, by definition, not a commercial transaction,

13

because the speaker receives no valuable consideration in return. There is no economic interest to the Plaintiffs, "sole" or otherwise.

Rather than follow this Court's clear precedent, the government attempts to negate them entirely by contorting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983). *Bolger* mentioned three factors pertaining to commercial speech: advertising, products, and economic motive. *Id.* at 66–67. But it went on to declare that when "*all* these characteristics" are present (emphasis in original), speech can be considered commercial. *Id.* The State, in contrast, urges the Court to negate the third part of the test, pointing out that "Plaintiffs state that they offer their services free of charge and contend that they have no economic motive," but that "[e]ven if true, however, this would not be dispositive." State Appellees Br. At 36. This contradicts the reliance on "*all* these characteristics" in *Bolger*, as well as the clear statements of this Court in *Valle Del Sol*, 709 F.3d at 818, and *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1106, that speech is not commercial unless it "solely" concerns Plaintiffs' economic interests and "does no more than" propose a commercial transaction. The State's novel test would sweep practically all public speech into the category of commercial speech,

14

thus causing a narrow exception to strict scrutiny to swallow the rule and eliminating the commercial and economic motive at the heart of the relevant test. This would turn the First Amendment on its head by depriving non-economic speech of the protection of strict scrutiny.

The State also resorts to a deeply disturbing argument that offering free information and services renders a speaker "commercial" and her motive "economic" simply because people value the items. This innovation would make it commercial speech for churches to give out communion, breast cancer advocates to distribute pink ribbons, and union organizers to hand out signs and t-shirts for rallies. But Supreme Court cases have rejected the notion that an expressive enterprise can be deemed commercial because of tangential value in items exchanged. *See Jamison v. Texas*, 318 U.S. 413 (1943) (holding it to be a non-commercial context where a Jehovah's Witness invited persons to a religious service and offered to sell religious books); *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943) ("the mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise"). As the New York district court explained, "an organization does not propose a

'commercial transaction' simply by offering a good or service that has economic value" if they get no money for it. *Evergreen Ass'n*, 801 F. Supp. 2d at 205. Pro-life pregnancy centers simply cannot be deemed commercial speakers under this Circuit's precedent where they propose no commercial transactions and offer information and services with no economic motive.

The Supreme Court went even further in *Riley* to shield non-profit groups even when they have a specific economic motive (unlike Plaintiffs here). *Riley* held that a non-profit group's fundraising, by paid professional solicitors, was not commercial speech. *Riley*, 487 U.S. at 797–800. Instead, because that speech was "inextricably intertwined" with protected speech, it was not commercial as a matter of law. *Id.* at 796. Plaintiffs' provision of free services and counseling here for the purpose of advancing their pro-life message does not come close to the level of the ostensibly commercial activity at issue in *Riley*, *where non-profit groups were actually asking for money* but did not fall under the commercial speech exception. The Act here attempts to regulate the provision of information and services for an express ideological purpose, where no compensation is received at all. It is not a commercial speech

regulation. This Court has imposed the "intertwined" test rigorously to protect ideological and advocacy organizations. *See, e.g.*, *Gaudiya Vaishnava Soc'y v. City & Cnty. of San Francisco*, 952 F.2d 1059, 1064 (9th Cir. 2011) ("Where the pure speech and commercial speech by the nonprofits during these activities is inextricably intertwined, the entirety must be classified as noncommercial and we must apply the test for fully protected speech.") "[T]he test" for identifying commercial speech is whether it proposes a commercial transaction. *Fox*, 492 U.S. at 473–74.

The State's confusion is further illustrated by its reliance on inapplicable cases like *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997). In that case the Court didn't even consider speech, much less distinguish between commercial and noncommercial speech. *Harrison* was instead a dormant Commerce Clause case, which merely found that a non-profit camp engages in commerce where it *charges campers a fee of $400 per week.* *Id.* at 567. Plaintiffs here charge nothing for their services. Equally misplaced is the City's reliance on *Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535 (4th Cir. 1998). This was an antitrust case that has

17

nothing to do with commercial speech, and simply held that a non-profit group *can* engage in commercial transactions. No one disputes that. The question is whether *this Act* regulates commercial transactions, or *these Plaintiffs actually engage in any*. They do not, and none of the cases cited by the government remotely suggests that they do just because they offer free services outside of any commercial transaction or economic interest of the Plaintiff.

Defendants likewise misplace their reliance on *Fargo Women's Health Org., Inc. v. Larson*, 381 N.W.2d 176 (N.D. 1986), which again weighs in Plaintiffs' favor. *Fargo* allowed a regulation of a particular pregnancy center *after* it had been found to advertise that it was *selling services for payments*. *Id.* at 180 ("[T]he Help clinic advertisements expressly state that financial assistance is available and that major credit cards are accepted"). Nothing of the sort exists here, nor (most importantly) does the Act declare that its compelled speech only applies to centers who claim to seek payment. The government then seems to suggest that anyone who "advertises" in the broadest sense of the word, by posting a public invitation to come and receive information and services that are completely free, somehow "does no more than propose

18

a commercial transaction" under *Valle Del Sol*, 709 F.3d at 818. This is simply incorrect. The notion that someone giving away something for free becomes a commercial speaker by publicly declaring the availability of the free item simply eliminates the commercial speech doctrine by eliminating the element of commerciality. This would gut the First Amendment protections that have always been afforded to ideological expression in "advertisements," meaning simply in public forums and airwaves. Ideological advocacy does not lose First Amendment protection simply because it is broadcast. *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1047 (N.D. Cal. 2015), is distinguishable due to the fact that the restrictions in that case apply only after a pregnancy center is found to have actually engaged in "untrue or misleading" speech, rather than in a prophylactic way to all centers regardless of whether they utter false speech, as the Act applies here. To the extent that some reasoning in *First Resort* might deem "advertisements" to be commercial absent any commercial transaction or economic motive, it is irreconcilable with Ninth Circuit or Supreme Court precedent and is therefore not persuasive.

Notably, the Fourth Circuit did not reach the holding the State urges, in its companion cases *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 286 (4th Cir. 2013), and *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 189 (4th Cir. 2013). The State Defendants attempt to use these cases to support the proposition that the information and services provided by Plaintiffs for free somehow do no more than propose commercial transactions because they "fulfill" the "commercial needs" of their clients. *See* State Br. at 36–37. But this omits the necessary component that there be a commercial *transaction*: *i.e.*, that Plaintiffs be on the receiving end of commercial benefit, instead of just unilaterally providing a free service. No Supreme Court or appellate decision shoehorns the mere act of offering a free service into the definition of a commercial transaction. Moreover, the pregnancy center Plaintiffs do far more than "fulfill commercial needs," they provide moral, emotional, and religious support to women in advocacy of a pro-life viewpoint and goal. See, e.g., EOR 34, 39–41. In the context of this "inextricably intertwined" expressive purpose, *see Riley*, 487 U.S. at 79, this Court

"must apply the test for fully protected speech," *Gaudiya Vaishnava Soc'y*, 952 F.2d at 1064, especially when Plaintiffs' services are free.

Instead of the government's overwrought interpretation of these Fourth Circuit cases, that circuit reached a much more modest holding: simply that discovery might uncover actual commercial transactions, and remanding where the District Court precluded such discovery. *See Greater Baltimore*, 721 F.3d at 291 ("[O]ur ruling today is simply this: the district court improperly denied the City essential discovery").

Indeed, contrary to Defendants' view, the Fourth Circuit affirmed the preliminary injunction granted in *Centro Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 463–64 (D. Md. 2011), where the court had concluded "that the speech regulated by the [law] is neither commercial nor professional." *Centro Tepeyac*, 722 F.3d at 189. The Fourth Circuit's dicta cannot be used to expand the commercial speech doctrine to the offering of completely free services, and even if it could, this Court is bounded to the opposite conclusion by *Valle Del Sol*, *Fox*, *Central Hudson*, *Riley*, and related cases cited above.

## 2. Rational basis review does not apply.

State Defendants attempt to argue that the Act warrants only rational basis review because it requires what the State calls "factual and uncontroversial information" with regard to the Act's compelled disclosure for licensed medical facilities. *See* State Br. at 38–42.

There is no "factual" exception to the First Amendment's presumptive ban on compelled speech. Caselaw protecting private speakers from compelled expression "cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech." *Riley*, 487 U.S. at 797–98. The rule against compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573–74. "[T]he government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." *Riley*, 487 U.S. at 791. Defendants therefore argue in vain that the Act's mention of the availability of reproductive healthcare services by the State of

California renders the disclosures innocuous, and therefore subject only to rational basis review. There is no fact/opinion distinction that immunizes compelled government speech outside the commercial context. Whether coerced statements are innocuous in the speaker's view is precisely the dispute. And here, where the State admits it disagrees with Plaintiffs' viewpoint and is regulating their speech because of that disagreement, the State has no authority to avoid First Amendment scrutiny by declaring its compulsion innocuous.

In addition to the fact that the Act is not a regulation of commercial speech due to the lack of commercial transactions in its elements or in Plaintiffs' activities, a heightened level of scrutiny would apply rather than intermediate scrutiny regardless. *Sorrell* held that even in a pharmaceutical commercial context, "heightened judicial scrutiny is warranted," and it ruled against Vermont's law as being insufficiently drawn to achieve the government's interests. 564 U.S. at 565, 572. "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Id.* at 578–79 (internal citations omitted). The State Defendants attempt to undermine this argument by stating that *Sorrell* would, at most, suggest intermediate scrutiny. *See*

State Br. at 41. But this circuit recently emphasized that *Sorrell*'s heightened scrutiny is more rigorous than intermediate scrutiny. *See Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 645 (9th Cir. 2016).

In this case, *Sorrell* serves to show the Act is viewpoint discriminatory, but strict rather than even heightened scrutiny applies, since the commercial context present in *Sorrell* is absent here.

## II. The Act violates the Plaintiffs-Appellants' right to the Free Exercise of Religion.

The Free Exercise Clause requires that laws that burden religious practice be both neutral toward religion and generally applicable. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993). Pursuant to *Lukumi*, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Id.* at 546.

As discussed above, and in Plaintiffs' opening brief, the Act is explicitly content and viewpoint based, with an explicit purpose to target "crisis pregnancy centers" that choose to discourage abortion and offer information with which the State disagrees. Furthermore, the Act is not generally applicable because by its explicit purpose and

24

justification the Act targets pro-life "crisis pregnancy centers" because of their anti-abortion expression. Such a law is not neutral or generally applicable with respect to the Plaintiffs—religious organizations that provide their free information and services in exercise of their religious beliefs in favor of the lives of preborn children and their mothers, and against abortion. The Act also specifically maintains exemptions for centers which participate in State family planning and Medi-Cal programs, which undermines its general applicability. EOR 72.

Furthermore, the fact that the Act implicates Plaintiffs' rights under the Free Speech Clause by compelling their speech serves as a separate and independent reason it must be subject to strict scrutiny under the Free Exercise Clause as a hybrid rights infringement. *See* Appellants' Opening Br. at 57–58. Defendants-Appellees do not attempt to rebut this argument, and in fact do not even mention Plaintiffs-Appellants' hybrid rights claim. They have therefore waived the argument. *See United States v. Dreyer*, 804 F.3d 1266, 1277 (9th Cir. 2015) ("Generally, an appellee waives any argument it fails to raise in its answering brief."). The District Court, too, failed to even address the hybrid rights claim or arguments in support thereof. EOR 16–17. This

Court should reverse the District Court's erroneous failure to award injunctive relief on Plaintiffs' hybrid rights claim.

### III. Plaintiffs-Appellants' challenge to the Act is ripe.

Defendant-Appellee Montgomery contends that Plaintiffs' challenge to the Act is not ripe, and that this appeal should therefore be dismissed. Nevertheless, as the district court below correctly held:

> While no one has threatened to institute enforcement proceedings against Plaintiffs for their failure to comply with the Act, Defendants do not suggest the Act will not be enforced. Plaintiffs sufficiently allege a "credible threat of prosecution" for failure to comply with the Act. *See Lopez [v. Candaele]*, 630 F.3d [775,] 785 [(9th Cir. 2010)].
>
> The Court also finds based upon Plaintiffs' clear intention not to comply with the Act due to their mission and pro-life views and the text of the Act, the record provides sufficient factual context to support their position that the action is ripe for judicial review.

EOR at 8.

Plaintiffs are currently suffering constitutional injury, as the Act is currently in effect. Black letter First Amendment precedent shows that in a free speech challenge, the speaker does not need to wait until the police issue him a warning or citation before he can challenge a law that regulates his speech. "Especially where protected speech may be at stake, a plaintiff need not risk prosecution in order to challenge a

26

statute." *Wolfson v. Brammer*, 616 F.3d 1045, 1059–60 (9th Cir. 2010) (citing *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003), and *Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir. 1996)).

Defendant Montgomery relies primarily on an inapposite case, *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134 (9th Cir 2000), to claim that Plaintiff Centers have failed to plead a "concrete plan" showing they will be in violation of the law. The holding in *Thomas* is distinct for the simple reason that the law in *Thomas* prohibited landlords from discriminating against non-married applicants, but the landlord plaintiffs had no non-married applicants, nor could they predict when or under what circumstances such applicants might arise, and for that reason they had no "concrete plan" for violating the statute. *Id*. at 1139. In other words, when the law in *Thomas* went into effect, the landlords would be continuing their existing behavior in a fully legal matter. The opposite is true here. Plaintiffs pled and affirmed that they will continue offering their services and will not comply with the law. Because the Act is currently in effect, Plaintiffs risk present prosecution for these failures to comply.

This is fully "concrete." Nothing more is needed for Defendants to seek prosecution, and therefore, Plaintiffs' claims are ripe for judicial review.

The Act contains an inherent threat of prosecution for violators. "[T]he threat [of prosecution] is latent in the existence of the statute." *Wolfson*, 616 F.3d at 1059 (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)). Recently enacted statutes impose a presumably reasonable fear of prosecution. *Bayless*, 320 F.3d at 1007 ("[P]laintiffs have standing where the 'State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise'" (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1987))). The Court is required to "relax the requirements of standing and ripeness" so that a plaintiff "need not await prosecution to seek preventative relief." *Wolfson*, 616 F.3d at 1060 (internal citations omitted). This Court's explanation supports the District Court's rejection of Defendant Montgomery's argument, when it pointed out that "[r]equiring [a plaintiff] to violate the Code as a precondition to bringing suit would . . . 'turn respect for the law on its head.'" *Id.* at 1061 (quoting *Bayless*, 320 F.3d at 1007); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (deeming it

unnecessary for a plaintiff to expose herself to prosecution before challenging a statute that deters the exercise of her constitutional rights).

Furthermore, prudential standing exists to challenge the Act because the Act's terms "require[] an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Wolfson*, 616 F.3d at 1060 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)). The Act imposes a Hobson's Choice on Plaintiff Centers, under which they must either recite the disclosures or violate the law. Plaintiffs "have sufficient standing [when] the regulation is directed at them in particular; it requires them to make significant changes in their everyday business practices; [and] if they fail to observe the [] rule they are quite clearly exposed to the imposition of strong sanctions." *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967); *cf. Hotel Emp & Rest. Emp's Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir. 1993).

Claims are especially ripe when one must "choose between refraining from core political speech" or risking enforcement. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014). The court

29

should recognize standing when the inquiry into plaintiff's claims "is primarily legal and does not require substantial further factual development." *Wolfson*, 616 F.3d at 1060 (involving a free speech challenge to restrictions on political solicitation and endorsements). This is true here because the Act will stand or fall primarily based on the Act's language and the government's alleged justifications, not on facts pertaining to enforcement.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants respectfully request that this Court reverse the judgment of the District Court and remand with instructions to enter the requested preliminary injunction.


Dated: April 28, 2016

                                             Respectfully submitted,

                                              *s/  Matthew S. Bowman*
Dean R. Broyles                              Matthew S. Bowman
California Bar No. 179535                     David A. Cortman
THE NATIONAL CENTER FOR LAW                  ALLIANCE DEFENDING FREEDOM
  AND POLICY                           440 First Street, NW, Suite 600
539 West Grand Avenue                        Washington, DC 20001
Escondido, California 92025                  (202) 393-8690
(760) 747-4529                               mbowman@ADFlegal.org
dbroyles@nclplaw.org                         dcortman@ADFlegal.org

Anne O'Connor
NATIONAL INSTITUTE OF FAMILY
  AND LIFE ADVOCATES
5601 Southpoint Centre Blvd.
Fredericksburg, VA 22407
(540) 372-3930
AOConnor@nifla.org

Kristen K. Waggoner
Kevin H. Theriot
Elissa M. Graves
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
kwaggoner@ADFlegal.org
ktheriot@ADFlegal.org
egraves@ADFlegal.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook font, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,813 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

_s/ Matthew S. Bowman_

Matthew S. Bowman
_Attorney for Plaintiffs_

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 28, 2016; I also served it upon the following CM/ECF participants, or by Federal Express if not ECF registered:

Anthony R. Hakl, III, Esq.
California Department of Justice, Office of the Attorney General
1300 I Street, 17th Floor
Sacramento, CA 95814
(916)322-9041; (916)324-8835 (fax)
Anthony.Hakl@doj.ca.gov
*Attorneys for Defendants Kamala Harris and Edmund G. Brown, Jr.*

Thomas D. Bunton, Esq.
County of San Diego Office of County Counsel
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
619-531-6456
Thomas.bunton@sdcounty.ca.gov
*Attorneys for Defendant Thomas Montgomery*

Steven Eugene Boehmer, Esq.
McDougal Love Eckis Boehmer & Foley
8100 La Mesa Blvd., Suite 200
La Mesa, CA 91942
(619)440-4444; (619)440-4907 (fax)
sboehmer@mclex.com
*Attorneys for Defendant Morgan Foley*

 s/  Matthew S. Bowman
Matthew S. Bowman
*Attorney for Plaintiffs*

33